UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS J. VILSACK, *et al.*,<br><br>Defendants. | Case No.  16-cv-00069-LB<br><br>**ORDER DISMISSING CASE**<br><br>[Re: ECF No. 14] |

## INTRODUCTION

This suit challenges the action of federal executive agencies under the Federal Advisory Committee Act ("FACA") 5 U.S.C. app. 2 § 5(b)(3)), and the Administrative Procedure Act ("APA") (5 U.S.C. § 706(2)). The plaintiff, Physicians Committee for Responsible Medicine, claims that the defendants, the United States Department of Agriculture ("USDA") and the U.S. Department of Health & Human Services ("HHS"), failed to "maintain" provisions to guard against "special interests" from "inappropriately influenc[ing]" the advisory committee that make recommendations for updating national dietary guidelines. *See* (1st Am. Compl. – ECF No. 8 at 19 [¶72].)[1]

---

[1] Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. The defendants, more accurately speaking, are the Secretaries of the USDA and HHS. It is easier to discuss matters, though, by referring to their agencies.

ORDER ─ No. 16-cv-00069-LB

The court must decide whether it has subject-matter jurisdiction to hear this claim. The court concludes that it does not. Because the relevant law provides "no meaningful standard" by which the court can judge the agencies' exercise of discretion, the question is non-justiciable. The court therefore grants the defendants' motion and dismisses this case for lack of subject-matter jurisdiction. *See Ctr. for Policy Analysis on Trade and Health (CPATH) v. Office of the United States Trade Representative,* 540 F.3d 940 (9th Cir. 2008); *Colo. Envtl. Coalition v. Wenker*, 353 F.3d 1221 (10th Cir. 2004).

## STATEMENT

**1. The 2015 Dietary Guidelines and their Advice on Dietary Cholesterol**

The National Nutrition Monitoring and Related Research Act (the "Nutrition Act") requires the USDA and HHS, "[a]t least every five years," to "publish a report entitled 'Dietary Guidelines for Americans.'" 7 U.S.C. § 5341(a)(1) (punctuation altered). Under that act, "Each such report shall contain nutritional and dietary information and guidelines for the general public, and shall be promoted by each Federal agency in carrying out any Federal food, nutrition, or health program." *Id.* The Nutrition Act mandates that the Dietary Guidelines "shall be based on the preponderance of the scientific and medical knowledge which is current at the time the report is prepared." 7 U.S.C. § 5341(a)(2).

The USDA and HHS have used an expert advisory committee since 1985 to provide advice and recommendations on the Dietary Guidelines. *Establishment of the 2015 Dietary Guidelines Advisory Comm.*, 78 Fed. Reg. 8147-01 (Feb. 5, 2013). That committee is known, appropriately enough, as the Dietary Guidelines Advisory Committee, or "DGAC." *E.g., id.* When, in 2013, USDA and HHS formed the DGAC that would make recommendations for the 2015 Dietary Guidelines, the agencies placed on that committee scientists who (according to the complaint) had received research funds from the Egg Nutrition Center. *E.g.,* (1st Am. Compl. – ECF No. 8 at 10-12 [¶¶ 25-34].) The Egg Nutrition Center is the research arm of a federal government entity (the American Egg Board) whose objective is "increasing the general demand for eggs, [and] egg products," and whose research is conducted "to the end that the marketing and utilization of eggs,

egg products, spent fowl, and products of spent fowl may be encouraged, expanded, improved, or made more acceptable." (*Id.* at 3, 6-7 [¶¶ 3, 16]) (quoting 7 C.F.R. § 1250.341(a)–(b)).

The 2015 Dietary Guidelines changed the government's nutritional advice to Americans concerning dietary cholesterol. This change holds the germ of the present dispute. Contrary to previous recommendations, and again according to the complaint, the 2015 Guidelines "discontinue[d] Defendants' longstanding advice that Americans consume no more than 300 milligrams per day of dietary cholesterol, with further reductions to no more than 200 milligrams per day for persons with or at high risk for cardiovascular disease . . . ." (1st Am. Compl. – ECF No. 8 at 17 [¶ 61].) This reflected DGAC's conclusion that cholesterol is no longer "a nutrient of concern for overconsumption" and that "available evidence shows no appreciable relationship between consumption of dietary cholesterol and serum cholesterol." (*See id.* at 13 [¶ 44]) (quoting DGAC, *Scientific Report of the 2015 Dietary Guidelines Advisory Committee* D17 (2015)). At the same time, though, the 2015 Guidelines continued to caution Americans that they should limit their intake of dietary cholesterol:

> The Key Recommendation from the *2010 Dietary Guidelines* to limit consumption of dietary cholesterol to 300 mg per day is not included in the 2015 edition, but this change does not suggest that dietary cholesterol is no longer important to consider when building healthy eating patterns. . . . [I]ndividuals should eat as little dietary cholesterol as possible while consuming a healthy eating pattern.

U.S. Dep't of Health and Human Svcs. and U.S. Dep't of Agriculture, *Dietary Guidelines for Americans 2015–2020* 32 (2015).

**2. The Plaintiff's Claim**

Plaintiff Physicians Committee is a "nonprofit public health organization that advocates for and educates the general public about preventive medicine through proper nutrition." (1st Am. Compl. – ECF No. 8 at 3 [¶ 5].) Physicians Committee alleges, in sum, that the presence on the DGAC of scientists who had received American Egg Board or Egg Nutrition Center funding compromised the advisory body's analysis and recommendations to the defendant agencies. More precisely, Physicians Committee alleges that these scientists swayed the DGAC into using

unreliable and tainted research — research that, in the plaintiff's view, had been distorted to promote the egg industry — and that their influence ultimately led the defendants to overturn the Guidelines' previous restrictions on dietary cholesterol. This "significantly jeopardized the public health," according to Physicians Committee, and was intended not to serve the public interest but instead to promote egg consumption in the U.S.

Based on these allegations, Physicians Committee advances a single legal claim. It argues that, by including the challenged scientists on the DGAC, and ultimately by adopting the DGAC's (supposedly compromised) recommendation concerning dietary cholesterol, USDA and HHS failed to guard against the "inappropriate influence" of "special interests" on the DGAC. This, Physicians Committee claims, violated FACA § 5(b)(3) and "constitutes agency action that is arbitrary, capricious, and contrary to law," in violation of the APA, 5 U.S.C. § 706(2). (1st Am. Compl. – ECF No. 8 at 18-19 [¶¶ 64-76].)

## GOVERNING LAW

1. **The Federal Advisory Committee Act (FACA)**

Among other things, FACA requires that, in "establishing, or authorizing the establishment of any advisory committee," Congress must put in place

> appropriate provisions to assure [*sic*] that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment . . . .

5 U.S.C. app. 2 § 5(b)(3). This mandate equally binds executive departments: "FACA makes clear that '[t]o the extent they are applicable, the guidelines set out in subsection (b) of this section *shall be followed* by the President, agency heads, or other Federal officials in creating an advisory committee.'" *CPATH*, 540 F.3d at 944 (quoting FACA § 5(c)) (emphasis in *CPATH*). But "FACA does not define what constitutes" inappropriate influence or explain how courts are to discern such influence. *See CPATH*, 540 F.3d at 944 (discussing "fairly balanced" mandate of FACA § 5(b)(2)).

**2. The Administrative Procedure Act (APA)**

The APA "embodies a 'basic presumption of judicial review.'" *CPATH*, 540 F.3d at 944 (quoting *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (quoting in turn *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993)). That is to say, normally under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Consequently, "agency actions are generally reviewable under federal question jurisdiction, pursuant to 28 U.S.C. § 1331." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003) (citing *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

There are limitations. The APA "withdraws jurisdiction to review agency decisions that are 'committed to agency discretion by law.'" *Spencer Enterprises,* 345 F.3d at 688 (quoting 5 U.S.C. § 701(a)(2)). "The Supreme Court has held that this provision [withdrawing jurisdiction] applies . . . where 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion . . . .'" *Spencer Enterprises,* 345 F.3d at 688 (quoting *Heckler v. Chaney,* 470 U.S. 821, 830 (1985)). There is effectively "no law [for the court] to apply" in such cases, so that the challenged action "is absolutely 'committed' to the agency's judgment." *CPATH*, 540 F.3d at 944 (citing *Heckler*, 470 U.S. at 830). This "very narrow exception" to judicial review should "rare[ly]" apply. *See, e.g., CPATH*, 540 F.3d at 944 ("narrow"); *Heckler*, 470 U.S. at 830 ("rare").

**ANALYSIS**

**1. Overview**

The court holds that there is "no meaningful standard" for deciding whether certain scientists exercised, or whether the USDA and HHS sufficiently guarded against, inappropriate influence in the DGAC. The court has seen no definition of "special interest." Perhaps more problematic, or in any case more pivotal here, the court has seen no law describing when a participant may be held to have "inappropriately influenced" an advisory committee. When does influence tip from normal, even expected, into the somehow inappropriate? What provisions will "assure" that an advisory committee will not be improperly influenced? The parties have not identified, and the court has not discovered, anything that gives the first hint of an answer. There is thus "no meaningful standard" for this court to apply in assessing whether the defendants complied with FACA § 5(b)(3). Composing and overseeing the DGAC must be deemed a matter that is "absolutely 'committed' to the agency's judgment," *CPATH*, 540 F.3d at 944 (citing *Heckler*, 470 U.S. at 830), and closed to judicial review. It is a non-justiciable matter, in other words, over which this court lacks subject-matter jurisdiction.

**2. The Laws in Question**

In determining whether a meaningful standard of review existed in *CPATH*, so that the court could decide whether an advisory committee was "fairly balanced" under FACA § 5(b)(2), the Ninth Circuit looked both to FACA and to the underlying substantive statute (in that case, the Trade Act of 1974). *CPATH*, 540 F.3d at 945. The *CPATH* court also suggested that such a standard "might, in some circumstances," lie in applicable regulations. *Id.* at 947. In this case, none of these sources yields a criterion for decision.

**2.1 Federal Advisory Committee Act (FACA)**

Consider FACA itself. As was true in *CPATH* under FACA § 5(b)(2)'s "fairly balanced" requirement, it is equally true here, under FACA § 5(b)(3), that "FACA does not define what constitutes" inappropriate influence or explain how courts are to discern such influence. *See*

*CPATH*, 540 F.3d at 944. In the Tenth Circuit's words (to which we return below), FACA § 5(b)(3) "does not give . . . any guidance as to when the line is crossed between appropriate and inappropriate influence." *Wenker,* 353 F.3d at 1231.

The legislative history of FACA likewise offers no measure for judging "inappropriate influence." *See CPATH*, 540 F.3d at 942-43 (discussing legislative history); *Wenker*, 353 F.3d at 1228 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)) (legislative history can affect preclusion of judicial review). That history recognizes the problem of special interests influencing advisory committees — the recognition that would become embodied in FACA § 5(b)(3) — but nothing in that history even starts to lay out a standard by which a court might judge when influence moves from ordinary to "inappropriate." *See* H.R. Rep. No. 92-1017 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496 (1972) (recognizing "danger of allowing special interest groups to exercise undue influence upon the Government through the dominance of advisory committees"); H.R. Conf. Rep. No. 92-1403 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3508.

### 2.2   National Nutrition Monitoring and Related Research Act

Nor does the Nutrition Act contain a decisional standard. *See* generally 7 U.S.C. §§ 5301-42. Specifically, the section of that act that mandates the Dietary Guidelines does not mention an advisory committee, much less set out rules describing when such a committee might be improperly influenced. 7 U.S.C. § 5341.

(The Nutrition Act also directed the President to establish a different advisory committee, the National Nutrition Monitoring Advisory Council, for advice in carrying out the act's other purposes. 7 U.S.C. § 5331. But even that statute, with respect to that other committee, does not address the topic of inappropriate influence. *See* 7 U.S.C. §§ 5331-32.)

### 2.3 General Advisory-Council Statute (42 U.S.C. § 217a)

Though formed to assist the defendants in formulating the Dietary Guidelines under the Nutrition Act, strictly speaking, the DGAC was formed under 42 U.S.C. § 217a. *See*

*Establishment of the 2015 Dietary Guidelines Advisory Committee*, 78 Fed. Reg. 8147-01 (Feb. 5, 2013). The latter is a general statute that authorizes HHS to "appoint such advisory councils or committees" as it "deems desirable." 42 U.S.C. § 217a. Nothing in this statute speaks to the issue of how HHS is to compose such councils, or to the question of inappropriate influence. *See id.*

### 2.4 USDA and HHS Regulatory Announcements

Pertinent regulatory material does not yield a guide to judging inappropriate influence. Announcing the formation of the 2015 DGAC, the *Federal Register* says this in the relevant vein:

> The Committee will be governed by provisions of [FACA], which sets forth standards for the formation and use of advisory committees.
>
> . . . .
>
> The 2015 DGAC will provide independent, science-based advice and recommendations for development of the Dietary Guidelines for Americans, 2015 . . . . The USDA Nutrition Evidence Library will assist the Committee in conducting and creating a transparent database of systematic reviews reflecting the most current research available on a wide range of food and nutrition-related topics to inform its recommendations.
>
> . . . .
>
> Individuals will be selected to serve as members of the Committee who are familiar with current scientific knowledge in the field of human nutrition and chronic disease. Expertise will be sought in specific specialty areas that may include but are not limited to cardiovascular disease; type 2 diabetes; overweight and obesity; osteoporosis; cancer; pediatrics; gerontology; maternal/gestational nutrition; epidemiology; general medicine; energy balance, which includes physical activity; nutrient bioavailability; nutrition biochemistry and physiology; food processing science, safety and technology; public health; nutrition education and behavior change; and/or nutrition-related systematic review methodology.

78 Fed. Reg. 8147-01. Subsequent announcements of DGAC meetings (which are all highly repetitive of one another), offer the following:

> To assist with satisfying the mandate, a discretionary federal advisory committee is established every five years to provide independent, science-based advice and recommendations. The DGAC consists of a panel of experts who are selected from the public/private sector. Individuals who are selected to serve on the Committee must have current scientific knowledge in the field of human nutrition and chronic disease. . . . Information on the DGAC membership will be available at www.DietaryGuidelines.gov.

*E.g.,* 78 Fed. Reg. 32391-01.

> The Committee will develop recommendations based on the preponderance of current scientific and medical knowledge using a systematic review approach. The DGAC will examine the current Dietary Guidelines for Americans, take into consideration new scientific evidence and current resource documents, and develop a report to the Secretaries of HHS and USDA that outlines its science-based recommendations and rationales . . . .

*E.g.,* 78 Fed. Reg. 51727; 78 Fed. Reg. 73865-01.

> In accordance with FACA and to promote transparency of the process, deliberations of the Committee will occur in a public forum.

*E.g.,* 79 Fed. Reg. 62622-01. These are the only *Federal Register* passages that touch upon the DGAC's independence. Or, in present terms, its freedom from inappropriate influence. This is as close as the regulatory material comes to providing "law to apply" to that topic.

Despite this lack of guidance, from any relevant law, one could imagine limit cases in which influence was blatantly inappropriate. "Perhaps bribes or threats" from or to an advisory-committee participant, for example, "could be regarded as inappropriate influence," clear even in the absence of a "meaningful standard of review," "but there is no allegation of anything of that nature here and so we do not need to consider those extreme situations." *Wenker*, 353 F.3d at 1231.

### 3. Controlling and Guiding Analogies

Without meaningful guidance to assess "inappropriate influence," the plaintiff's § 5(b)(3) claim must be held non-justiciable. The Ninth Circuit's decision in *CPATH* compels this conclusion. Despite its minor differences from this case, indeed, *CPATH* controls the present analysis. And the Tenth Circuit's decision in *Wenker*, under FACA § 5(b)(3) — the provision in question here — confirms that that conclusion is correct.

#### 3.1 *CPATH*

The Ninth Circuit held in *CPATH* that a claim under "[t]he 'fairly balanced' membership requirement" of FACA § 5(b)(2), as "applied to the Trade Act of 1974," was "not reviewable because those statutes provide" the courts with "no meaningful standards to apply." *CPATH*, 540

F.3d at 942. The district court therefore had correctly held the § 5(b)(2) claim to be "non-justiciable," and had "properly dismissed the complaint" for lack of subject-matter jurisdiction. *Id.* at 942, 943-44.

The Trade Act of 1974 directed the relevant executive departments to form "a series of advisory committees." *Id.* at 942 (citing 19 U.S.C. § 2155(c)). That same act "require[d]" those committees, "insofar as is practicable, [to] be representative of all industry, labor, agricultural, or service interests (including small business interests) in the sector or functional areas concerned." *CPATH*, 540 F.3d at 942 (quoting 19 U.S.C. § 2155(c)(2)). Legislative history confirmed that "Congress's stated purpose for this portion of the Trade Act" was to ensure that the advisory bodies were "representative of the producing sectors of our economy." *CPATH*, 540 F.3d at 942-43 (quoting 1974 U.S.C.C.A.N. 7186, 7248-49). For its part, FACA § 5(b)(2) requires that all federal advisory committees be "fairly balanced in terms of the points of view represented and the functions to be performed." 5 U.S.C. app. 2 § 5(b)(2) (quoted in *CPATH*, 540 F.3d at 943). The plaintiff in *CPATH* claimed that, , against the backdrop of the Trade Act, the advisory committees violated FACA's "fairly balanced" mandate because they did "not . . . have any members representing the public health community." *See CPATH*, 540 F.3d at 943.

The Ninth Circuit agreed with the district court that this claim was non-justiciable. *Id.* at 942, 944-47. While acknowledging that FACA's "fairly balanced" requirement is mandatory, the appellate court observed that "FACA does not define what constitutes a 'fairly balanced' committee — in terms of points of view represented or functionality—or how that balance is to be determined." *Id.* at 943. In reasoning that applies equally to this case, the court continued:

> [T]he Trade Act and FACA . . . provide us with no meaningful standards to apply when considering whether [the defendant agency] complied with the "fairly balanced" requirement imposed by FACA. . . .
>
> The[se] statutes . . . are devoid of standards suggesting what Congress intended when it required all advisory committees to be "fairly balanced." As a result, determination whether a given [committee] is in compliance with the Trade Act's requirements is "hopelessly manipulable" . . . . [*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 427, 429 (D.C. Cir. 1989) (Silberman, J., concurring in judgment).] Given that context, analysis of whether the [committees] satisfy the "fairly balanced" requirement — both in terms of function and points of view represented — is a task "not properly undertaken by

> . . . unelected federal judges." *Id.* at 427-28. Instead, . . . this determination is a process best left to the executive and legislative branches of government.
>
> FACA does not, for example, articulate what perspectives must be considered when determining if the advisory committee is fairly balanced. While the Trade Act states that the [committees] "shall, insofar as is practicable, be representative of all industry, labor, agricultural, or service interests (including small business interests) in the sector or functional areas concerned[,]" 19 U.S.C. § 2155(c)(2), that section provides no standards to allow us to determine when it is, or when it is not, practicable to appoint a certain interest onto one of the [committees]. Finally, the suggestion in the Trade Act's legislative history that the [committees] should be "representative of the producing sectors of our economy[,]" S. Rep. No. 93–1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 7249, provides no guidance. We are in no position to determine whether the present composition of the [committees] [is] "representative" and therefore in compliance with the Trade Act. We have no reasoned basis from which to conclude whether adding a public health representative to any one of the [committees] would achieve the proper balance, or whether it would be practicable to do so. It is not a "difficult question" that courts must answer . . . . Instead, it is a political question arising out of a statute that provides us with no meaningful standards to apply. This is a question that we are ill-suited to decide.
>
> . . . .
>
> We therefore conclude that neither FACA nor the Trade Act provide[s] us with meaningful standards to apply when determining whether the "fairly balanced" requirement has been violated. . . .

*CPATH*, 540 F.3d at 540 at 945, 947 (some citations omitted). "Thus, under the plain language of FACA and the Trade Act," the plaintiff's complaint was "non-reviewable, and the district court correctly dismissed [it] . . .on that basis." *Id.* at 947.

This court finds no important distinction between *CPATH* and this case. The court finds no significant difference between the "fairly balanced" membership requirement of FACA § 5(b)(2) and the "provisions to avoid to inappropriate influence" mandate of § 5(b)(3), or between the Trade Act of 1974 and the Nutrition Act, in terms of the guidance that these laws offer to proposed judicial review, and so the court sees no difference that would avoid *CPATH*'s logic to make PCRM's § 5(b)(3) claim reviewable.

To some degree, in fact, the differences between this case and *CPATH* make that case's logic apply more forcefully here. The Trade Act in *CPATH* gave at least some shape to the representative "balance" that the advisory committees were to exhibit. *See* 19 U.S.C. § 2155(c)(2) (requiring advisory committees to represent "all industry, labor, agricultural, or service interests

ORDER ─ No.16-cv-00069-LB    11

(including small business interests) in the sector or functional areas concerned"). Here, by contrast, nothing that the court has seen in FACA, the Nutrition Act, or any related material, begins to describe when it is or is not practicable to appoint certain interests, whether the composition is representative, or when provisions might "assure" that a "special interest" (however it is defined) does not "inappropriately influence" an advisory committee. If the § 5(b)(2) claim in *CPATH* was "non-reviewable," then, *a fortiori*, so, too, is the Physicians Committee's present § 5(b)(3) claim.

### 3.2 *Wenker*

The control of a Ninth Circuit decision is enough to dispose of this case. It is useful nonetheless to review the Tenth Circuit's decision in *Wenker*. That case dealt with FACA § 5(b)(3), the exact statute in question here; its basic logic parallels that of *CPATH*; and, if *CPATH* did not exist, or could be effectively distinguished, this court would likely follow *Wenker* to hold the instant § 5(b)(3) claim non-justiciable.

The advisory committees in *Wenker* were formed under the Federal Land Policy and Management Act (specifically, 43 U.S.C. § 1739) and related regulations to make non-binding recommendations to the federal government on issues of land use. *Wenker*, 353 F.3d at 1223-24. At issue in *Wenker* were 14 vacancies on the committees responsible for Colorado. *Id.* at 1226. The Colorado governor had submitted 13 candidates to fill those vacancies; the general public had submitted 50. *Id.* All 13 of the governor's candidates were appointed; no public candidate was. *Id.* The plaintiffs in *Wenker* — "two Colorado environmental organizations and two individuals who applied for, but did not receive, [advisory-committee] positions" — challenged the appointments under FACA § 5(b)(3). *Id.* They alleged that the "appointments resulted from inappropriate influence" by the governor in violation of § 5(b)(3). *Id.*

The Tenth Circuit affirmed the district court's dismissal of the suit as "not justiciable." *Id.* at 1224, 1230-32. Both courts could find no "meaningful legal standard" by which to assess inappropriate influence. *See id.* As in *CPATH*, the relevant laws in *Wenker* gave at least as much guidance as does anything in this case — and yet, as in *CPATH*, the *Wenker* court found that

guidance jurisdictionally insufficient. The governing statute in *Wenker* charged the Department of the Interior with forming advisory councils "representative of the various major citizens' interests concerning the problems relating to land use . . . within the area for which an advisory council is established." *Wenker*, 353 F.3d at 1224 (quoting 43 U.S.C. § 1739(a)). Related regulations specified the makeup of the committees, requiring them to be "representative of the interests of . . . 3 general groups." *Wenker*, 353 F.3d at 1225 (quoting 43 C.F.R. § 1784.6-1(c)). (Those three groups are not essential to this discussion but are described in the margin.[2]) The regulations required "balanced and broad representation" from those three groups. *Wenker*, 353 F.3d at 1225 (quoting 43 C.F.R. § 1784.6-1(d)).

The Tenth Circuit saw no "meaningful standard" in any of this to judge whether the governor's numerically outsize appointments amounted to "inappropriate influence." *Wenker*, 353 F.3d at 1230-32. The court recognized that "[e]xemption from judicial review of agency decisions is narrow." *Id.* at 1228 (citing *Heckler*, 470 U.S. at 830). Yet the § 5(b)(3) "inappropriate influence" claim lay beyond that review:

> We conclude that § 5(b)(3) does not provide a meaningful standard of review for a court to apply. . . .
>
> The problem we have with this claim centers on the word "inappropriate." The very structure of the statute and regulations calls for various special interest groups to recommend candidates . . . that will be giving advice on issues of interest to the recommending entities. . . . So, it is not only obvious, but is apparently desired, that the nominees would be aligned with, and hence influenced by, the special interest groups that recommended them. The question is, what does § 5(b)(1)-(3) mean when it prohibits only "inappropriate" influence? . . . [T]he statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence. . . .
>
> What is alleged here is simply that Governor Owens will have an inappropriate amount of influence over these [committees] by virtue of having nominated or

---

[2] "These three groups are[:] (1) people with interests in federal grazing permits, transportation or rights-of-way, outdoor recreation, commercial timber operations, or energy and mineral development; (2) people representing nationally or regionally recognized environmental groups, 'dispersed recreational activities,' archeological and historical interests, or nationally or regionally recognized wild horse and burro interest groups; and (3) persons who hold state, county or local elected office, are employed by state natural resources agencies, represent local Indian tribes, are employed as academics in natural resource management or the natural sciences, or represent the affected public-at-large." *Wenker*, 353 F.3d at 1225 (citing 43 C.F.R. § 1784.6–1(c)(1)–(3)).

> endorsed such a large percentage of the[ir] membership . . . . But whether Congress intended that kind of hypothetical future influence to be inappropriate, and hence illegal under § 5(b)(3), is something as to which we have absolutely no guidance, guidelines or standards from Congress. Thus, we hold that plaintiffs' claim under § 5(b)(3) is not justiciable.

*Wenker*, 353 F.3d at 1231-32.

No operative distinction — for present purposes — separates *Wenker* from this case. Here, too, the relevant laws offer no "guidance, guidelines[,] or standards" by which this court might assess whether the challenged scientists' presence on the DGAC amounts to inappropriate influence. Maybe so, maybe not. The court has not been given the minimal tools it would need to say. The question must thus be deemed a political one better committed, and in fact committed, to the discretion of the legislative and executive branches. It is non-justiciable and this court lacks subject-matter jurisdiction over it.

\* \* \*

This does not present the court with a merely "difficult" question. *See* ECF No. 18 at 31-32 (quoting *Microbiological Criteria*, 886 F.2d at 434 (in partial dissent)). The operative problem instead is that the relevant law provides "no meaningful standard" by which the court can approach the question — difficult or otherwise. The issue is thus "absolutely 'committed' to the agency's judgment." *CPATH*, 540 F.3d at 944 (citing *Heckler*, 470 U.S. at 830). If the court were to decide that question nonetheless, it would not be dutifully discharging its judicial responsibility, *see Microbiological Criteria*, 886 F.2d at 434, it would be wrongfully substituting its own judgment for that of a coordinate branch of government. Which is why the issue is at bottom jurisdictional.

**CONCLUSION**

The court grants the defendants' motion (ECF No. 14), holds that the plaintiff's lone claim is non-justiciable, and, under Federal Rule of Civil Procedure 12(b)(1), dismisses the complaint with prejudice for lack of subject-matter jurisdiction.

This disposes of ECF No. 14.

**IT IS SO ORDERED.**

Dated: October 12, 2016

_____
LAUREL BEELER
United States Magistrate Judge